**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TIMOTHY ATWOOD and PHOEBE GRANADO, | No. 2:24-cv-01127-RJC |
| Plaintiffs, | |
| v. | |
| FEDERAL EXPRESS CORPORATION, successor by merger to FEDEX GROUND PACKAGE SYSTEM, INC., | |
| Defendants. | |

**PLAINTIFFS' RESPONSIVE STATEMENT OF FACTS AND ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF PHOEBE GRANADO**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56(b)(1), Plaintiffs submit this responsive statement of material facts and additional material facts in opposition to Defendant Federal Express Corporation's ("FedEx"), successor by merger to FedEx Ground Package System, Inc., Motion for Summary Judgment (ECF No. 59).

I.    **PLAINTIFFS' RESPONSES TO DEFENDANT'S STATEMENT OF FACTS**

1.    FedEx is a registered motor carrier with the U.S. Department of Transportation ("USDOT") and the Federal Motor Carrier Safety Administration ("FMCSA"), as a motor carrier of property for compensation engaged in interstate and foreign commerce throughout the United States. (Linder Decl. ¶ 3, attached as Ex. A.[Footnote 1])

Footnote 1: All references to exhibits are attached to the Appendix in Support of FedEx's Motion for Summary Judgment Against Plaintiff Phoebe Granado, unless otherwise noted.

**Response: Admitted.**

2.      FedEx offers package pickup, delivery, and information services across the United States. As is the case across FedEx's network of stations, including at all times relevant to this action, packages from all across America are being shipped from and delivered throughout all states in the country. (*See id.* ¶ 6.)

**Response: Admitted.**

3.      Customers contract with FedEx for those services. FedEx, in turn, contracts with independent businesses ("Service Providers") to provide pickup and delivery services between customers and FedEx's sorting stations. (Pierce Decl. ¶¶ 4-5, attached as Ex. B.)

**Response: Denied. Service Providers are not "independent businesses." Rather, they are intermediary entities that operate within FedEx's system and under FedEx's rules. *See* Plaintiffs' Additional Material Facts ("AMF"), *infra* ¶¶ 2–20.**

4.      FedEx maintains some records pertaining to the activity of drivers employed by Service Providers to the extent required to comply with regulatory requirements imposed on FedEx as a registered motor carrier with the USDOT. (Ex. A, Linder Decl. ¶¶ 8–10.) FedEx refers to these records informally as "scanner data."

**Response: Admitted that FedEx maintains records pertaining to the activity of drivers. Denied as to why FedEx maintains these records, which is not established.**

5.      Scanner data reflect the time at which a driver logs in to the scanner as "on duty" (as defined by the USDOT), the date, information identifying the vehicle used each day (the vehicle number), and the time at which the driver logs out of the scanner as "off duty" (as defined by the USDOT), among other things. The USDOT requires tracking of the drivers' on duty time. (*Id.* ¶¶ 11–13.)

**Response: Admitted.**

6.      Scanner data does not reflect any breaks that a driver may take in the middle of a workday; instead, once a driver has logged in as "on duty" for DOT purposes, they cannot log out as "off duty" until their day is finished. (*Id.* ¶ 13; *see also* Connally Decl. ¶¶ 19-20, attached as Ex. C.) Though a driver may take breaks throughout their workday, a driver cannot at any point, for any reason, log out of a scanner in the middle of a workday and then log back into it later, per DOT regulations. (Ex. A, Linder Decl. ¶ 13; *see also* Granado Dep. 97:14-20 (admitting that she remained logged in to her scanner throughout the day, even when she was taking a break), excerpts attached at Ex. D.)

**Response: Admitted.**

7.      Scanner data does not capture the weight of the vehicle the driver operates. To determine the gross vehicle weight rating ("GVWR") for each service-provider-owned vehicle, the vehicle number must be cross-referenced against FedEx's Vehicle Maintenance System ("VMS") in an attempt to locate that information. (Newmont Decl. ¶¶ 3-5, 7, attached as Ex. E.)

**Response: Denied. The scanner data includes the gross vehicle weight rating. (*See generally* Def's Ex. H, Granado Summary Data). Additionally, Granado testified that drivers use the same scanners that capture on- and off-duty time to identify their vehicles by scanning a barcode on the vehicle. (*See* Pls.' Ex. H, Excerpts from Granado Dep. at 211:12–25).**

8.      FedEx has incomplete information about the GVWR for the vehicles used by Service Providers' drivers because those vehicles are owned by the Service Providers, not FedEx. (*Id.* ¶ 5.) If a Service Provider does not provide the GVWR for its vehicles in the VMS, FedEx does not have that information. (*Id.*)

**Response: Admitted. However, 96% of Granado's Scanner Data includes the GVWR. (*See* Def.'s Ex. H).**

9.      Similarly, if a driver enters the vehicle number incorrectly, the vehicle cannot be located in the VMS. (*Id.* ¶ 7.)

**Response: Admitted.**

10.      Additionally, Service Providers may use rental vehicles for various reasons and VMS does not contain any information on rental vehicles. (*Id.* ¶ 6.)

**Response: Admitted.**

11.      Service Providers enter into a business-to-business contract ("Agreement") with FedEx. (*See, e.g.*, Jammin Delivery Inc. ISPA, January 2, 2021, with Addenda through May 20, 2022, excerpts attached as Ex. F.) The Agreement states that Service Providers have "sole and complete discretion in the staffing, selection, hiring, training, supervision, assignment, hours and days worked, discipline, termination, compensation, benefits, and all other terms and conditions of employment of its Personnel." (*Id.* ¶ 6.4.)

**Response: Admitted.**

12.      Service Providers contractually agree to treat all personnel as their employees, to bear all responsibility for employer-related expenses and legal compliance, and to maintain their own payroll and employment records. (*Id.* ¶ 6.2.) Service Providers also agree to provide FedEx annual written certifications of their compliance with their obligations, and FedEx may request proof of compliance. (*Id.*)

**Response: Admitted.**

13.      Granado worked as a delivery driver for two Service Providers in Texas: DWIL Co. and Jammin Delivery Inc. (Ex. D, Granado Dep. 17:4-10, 69:9-14; *see also id.* at 17:17-18

(stating that she was "[j]ust a driver" for DWIL); Granado's *Claiborne* Opt-In Questionnaire at

I.1.c (same), attached as Exhibit G.)

**Response: Admitted, though Granado also "worked" for FedEx at that time, as**

**FedEx was her joint employer.**

14.    The summary data reflects that Granado drove for DWIL from November 27,

2015 until April 6, 2017, and drove for Jammin from February 29, 2016, until August 23, 2024.

(*See* Granado Summary Data, FX_Granado_000001, attached as Ex. H.)

**Response: Admitted as to what the summary scanner data shows.**

15.    Granado claims that DWIL paid her a weekly salary of $625 or $650. (Ex. G,

Granado's *Claiborne* Opt-In Questionnaire at I.2.a; Ex. D, Granado Dep. 175:15-25.)

**Response: Admitted.**

16.    The summary data reflects that Granado drove during 61 different workweeks

for DWIL, but Granado produced only one paystub from her employment with DWIL.

(*Compare* Ex. H, Granado Summary Data, *with* GRANADO, PHOEBE 000001, attached as

Ex. I.)

**Response: Admitted that Granado has produced one paystub from DWIL. Denied**

**as to the summary data, which indicates that Granado worked 59 different workweeks for**

**DWIL. (*See* Def.'s Ex. H).**

17.    The paystub Granado produced reflects payment of a "[s]alary" of $650.00 for the

one-week pay period of November 4, 2016, through November 10, 2016. (Ex. I, GRANADO,

PHOEBE 000001.) The summary data shows that Granado drove for DWIL on two days during

that pay period (November 4 and November 8), for which she logged a total of 17.3 DOT on-

duty hours. (*See* Ex. H, Granado Summary Data.)

**Response: Admitted only as to what the paystub and scanner data show. Granado goes on to confirm that she would have worked other days during that week that were not reflected in the scanner data. (*See* Pls.' Ex. H at 247:17–20).**

18.    When reviewing her scanner data for this pay period, Granado testified that "I don't recall" working additional days during that week, but "I'm assuming I must have . . . and just not logged into a scanner" because "I don't think [DWIL] would've paid me for the whole week if I wasn't there." (Ex. D, Granado Dep. 246:15–247:2.) She further explained that her assumption is based on how she was paid by Jammin Delivery, stating that "I'm pretty sure [DWIL] was the exact same," but then also admitted she would have to look at her paystubs to confirm that. (*Id.* at 247:3-16.)

**Response: Denied as it mischaracterizes the testimony. After saying she was not logged in, Granado states "I could have been helper that day or the other days." (Pls.' Ex. H at 246:23–24). Granado additionally testified that scanner data doesn't show time spent as a helper or training. (*Id*. at 252:4–10).**

19.    Granado admitted that she received physical paychecks from DWIL and further admitted that she retained most if not all of those paycheck stubs. (*Id.* at 188:21–190:6 (testifying that she has a "ton" of paystubs from DWIL in her attic; that DWIL paid her weekly and she had retained "almost all a year and a half worth of paycheck stubs"; and stating that at the time of her deposition she had not "thrown any away").) Plaintiffs' counsel, who also represented Granado in the *Claiborne* case, agreed to produce those paystubs in that case, but did not do so. (*Id.* at 190:7–191:9.)

**Response: Admitted, except that if Plaintiff possesses paystubs that were not previously produced in *Claiborne*, they will be produced here in the normal course of**

**discovery, which has not yet begun.  Further, Plaintiff notes that she was a member of the FLSA collective in *Claiborne*, and her discovery obligations in *Claiborne* ended when the collective was decertified.**

20.    Granado has not produced any time records from her employment with DWIL. Granado testified that she did not keep track of her hours worked when she drove for DWIL, and admits that she has no records showing how many hours she actually worked in any given week for DWIL. (*Id*. at 79:1–80:2, 92:7-19.)

**Response: Admitted that Granado did not produce time records from her employment with DWIL. However, Granado testified that DWIL provided neither time records, nor a timekeeping system. (*See* Pls.' Ex. H at 222:25-223:1; 223:17–19).**

21.    Granado admits that scanner data cannot be used to determine her compensable time for DWIL, and that she has no other records to prove the actual days and hours that she worked for DWIL. (*Id*. at 253:8–254:10.) Granado also testified that she has no reason to dispute the accuracy of the scanner data insofar as it reflects the times at which she logged in and out of the scanner. (*Id*. at 240:13–245:3.)

**Response: Admitted as to what scanner's log in and log out times reflect. Granado testified that the scanner data underrepresents the hours she worked, because it did not track the time she worked before dispatching, nor did it track the time she worked as a helper for other drivers. (*See* AMF ¶ 30; Pls.' Ex. H at 214:19–215:3, 215:20–24, 215:20–24, 216:13–16, 218:4–20, 219:1–14, 222:10–13, 281:16–23).**

22.    Granado testified that she believes she worked more than 40 hours in at least some weeks from October 2015 to January 2019 because "[s]ome of the times . . . I got stuck on an out-of-town route because I had a flat tire or the truck broke down, which happened quite

often." (*Id.* at 79:1-23.) She also stated that there were "times" when she recalls "getting back" to the San Angelo station at "7:00, 8:00 at night." (*Id.*)

**Response: Admitted.**

23.    Granado claims that she "worked about 60 hours per week" or "close to 75 during peak season." (Ex. G, Granado's Claiborne Opt-In Questionnaire, at I.2.g.) During her deposition, however, she admitted she did not work these hours "every week" but that, instead, "it's probably about 50 hours per week" and "60 was like the max if I did work that." (Ex. D, Granado Dep. 177:12-25.) She also stated she believed the "number would be higher" during peak season "because of the volume of delivery." (*Id.* at 178:1-3.)

**Response: Admitted as to Granado's statements. Denied to the extent that this statement implies that Granado gave inconsistent testimony. Granado testified that she worked about 50 to 60 hours per week, or 75 hours per week during peak season. (*See* Pls.' Ex. H at 177:17–178:3).**

24.    Granado admits she did nothing to confirm that she worked more than 40 hours in any workweek during her employment with DWIL. (*Id.* at 81:2-6; *see also id.* at 178:10-179:5 (admitting she did nothing "to determine how many weeks" she believes she "would have worked under 40 hours versus over 40 hours" and that her assessment of her hours is "[b]ased on my recollection of how late I would stay out").)

**Response: Denied as it mischaracterizes the testimony. Granado could not provide confirmation because she was not provided with means to track her time worked. (Pls.' Ex. H at 222:25–223:1, 223:17–19).**

25.    Granado did not discuss potential overtime pay with the owner of DWIL during the application process. (*Id.* at 84:23-85:4.) Nor did Granado ever tell anyone at DWIL

that she believed she was owed unpaid overtime. (*Id*. at 71:7-15.)

**Response: Admitted.**

26.     During her deposition, Granado agreed she is "claiming" that she was not paid overtime when she was driving for DWIL "[b]ecause in my understanding we're salary" and "from what I thought," that meant "we got paid salary no matter how long it took us to do it." (*Id.* at 66:23-67:5; *accord id.* at 71:16-20 (stating that she did not tell anyone at FedEx she thought she was owed overtime "[b]ecause once again, I thought salary was salary" and "[i]t didn't matter how many hours you worked"); *id.* at 84:23-85:4 (explaining that she did not discuss potential overtime with DWIL when she applied "[b]ecause . . . my understanding is salary, that's what you were going to get paid no matter how many hours you worked, or how less hours you worked").

**Response: Admitted as to what Granado said in her deposition. However, the scanner data shows that she worked over forty hours in weeks driving at both DWIL and Jammin. (*See generally* Def.'s Ex. H).**

27.     Granado testified that DWIL is the only Service Provider that she claims owes her any unpaid overtime. (*Id.* at 196:16-23.)

**Response: Admitted as to what Granado said in her deposition. However, the scanner data shows that she worked over forty hours in weeks driving at both DWIL and Jammin. (*See generally* Def.'s Ex. H). Further, Granado filed an opt-in to the *Clairborne* action, indicating she is claiming unpaid overtime. (*See* Pls.' Ex. I, Granado Opt-in Form).**

28.     Granado admits that she did not work any overtime for Jammin, and testified that she is not claiming that she is owed any unpaid overtime from her time working for Jammin. (*Id.* at 67:6-22 (testifying that "Jammin Delivery has a majority of in-town routes we don't work

more than 40 hours," and agreeing that she never worked more than 40 hours per week for

Jammin), 196:16-23 (affirming that the only Service Provider that she is claiming owes her

unpaid overtime is DWIL); *see also* Ex. G, Granado's Claiborne Opt-In Questionnaire at Ex. A,

I.2.g (stating, under penalty of perjury, that when she worked for Jammin she "work[ed] 40

hours per week," a number that did not "change[] since [the Service Provider was] careful about

our hours").)

**Response: Admitted as to Granado's statements, though she clarified in her
deposition that she may have worked more than 40 hours per week while driving for
Jammin. (*See* Pls.' Ex. H at 208:22–209:4). In any event, the scanner data shows that
Granado worked over 40 hours in 119 weeks at Jammin. (*See* Def.'s Ex. H, Granado
Summary Data). Further, Granado filed an opt-in to the *Claiborne* action, indicating she is
claiming unpaid overtime. (*See* Pls.' Ex. I).**

29.    The owner of Jammin attested that Granado did not work any overtime during

weeks in which she drove a vehicle with a GVWR of 10,000 pounds or less. (Ex. C, Connally

Decl. ¶¶ 10-11.)

**Response: Admitted as to what the owner attested; however, the scanner data shows
that Granado worked over 40 hours in 119 weeks at Jammin. (*See* Def.'s Ex. H, Granado
Summary Data). Further, Granado filed an opt-in to the *Claiborne* action, indicating she is
claiming unpaid overtime. (*See* Pls.' Ex. I).**

30.    Granado claims Jammin paid her a weekly salary, but testified that if she missed

a day she would not be paid for the missed day. (Ex. D, Granado Dep. 132:3-15, 247:9-11.)

**Response: Admitted.**

31.    Jammin paid Granado a salary when she primarily drove vehicles with a GVWR

of 10,001 pounds or more, and paid her an hourly rate of pay when she exclusively drove vehicles with a GVWR under 10,001 pounds. (Ex. C, Connally Decl. ¶¶ 10-11.)

**Response: Denied. Granado testified only that she was paid a weekly rate at Jammin (*see* Pls.' Ex. H at 202:10–23), and that if drivers miss a workday and do not use a sick day, then they are not paid for that day. (*Id.* at 247:10–11).**

32.     The summary data reflects that Granado drove during 326 different workweeks for Jammin, but Granado produced only five paystubs from her employment with Jammin. (*Compare* Ex. G, Granado Summary Data, *with* GRANADO, PHOEBE 000002, 000007-10, attached as Ex. J.) Granado did not record more than 40 hours of on-duty time in any of the workweeks for which she produced paystubs. (*Id.*)

**Response: Admitted.**

33.     Granado admits that she retained physical paystubs from her employment with Jammin. (Ex. D, Granado Dep. 189:17-23; 192:3-22 (testifying that for a portion of her employment with Jammin she may not have had physical paystubs because she was paid via direct deposit, but that at the time of her deposition, and before converting to direct deposit, she did receive physical paystubs from Jammin and did retain them).) Plaintiffs' counsel, who also represented Granado in the *Claiborne* case, agreed to produce those paystubs in that case, but did not do so. (*Id.* at 190:7–191:9.)

**Response: Admitted, except that if Plaintiff possesses paystubs that were not previously produced in *Claiborne*, they will be produced here in the normal course of discovery, which has not yet begun.  Further, Plaintiff notes that she was a member of the FLSA collective in *Claiborne*, and her discovery obligations in *Claiborne* ended when the collective was decertified.**

34.    Granado testified that at least as early as 2019, Jammin tracked its drivers' compensable time using an app called eTruckbiz. (*Id.* at 47:14-24 (referring to "eBizTruck").)

**Response: Admitted.**

35.    The owner of Jammin attested that he chose to use eTruckbiz to track Jammin's drivers' compensable time, and that FedEx has nothing to do with eTruckbiz. (Ex. C, Connally Decl. ¶ 17.)

**Response: Admitted.**

36.    Granado continued to work for Jammin after opting in to *Claiborne*, and after filing her own lawsuit, yet has not produced a single time record from her employment with Jammin, and has not produced a paystub from any time after August 2022. (*Compare* Ex. J, GRANADO, PHOEBE 000002, 000007-10, *with* Ex. H, Granado Summary Data.) Granado admits that she could obtain her time records from Jammin, but she has not done so. (Ex. D, Granado Dep. 80:9-16.)

**Response: Admitted.**

37.    Granado admits that she ran errands and took breaks during her work day and did not log out of the scanner when doing so. (*Id.* at 162:1–163:18 (admitting that she would run personal errands, primarily to attend doctor appointments, in the middle of her work day, and that she never logged out when running an errand or on a break).)

**Response: Admitted.**

38.    Granado testified that when she worked for Jammin she always entered 7:30 am as her on duty time in the scanner whether or not that was her actual on duty time. (*Id.* at 217:23–220:2 (testifying that she was told to always enter 7:30 as her on duty time for Jammin, and that she did not know why that was Jammin's policy).

**Response: Admitted.**

39.    Granado opted in to the *Claiborne* case on September 10, 2020. (*Claiborne*, ECF No. 175-134.) Since signing the opt-in form, Granado has done nothing to confirm that she ever worked any overtime for either DWIL or Jammin. (Ex. D, Granado Dep. 81:2-6.)

**Response: Admitted as to the opt-in date. Denied that Granado has "done nothing" to confirm her overtime work; she has received scanner data from FedEx indicating that she regularly worked more than 40 hours per week for DWIL and Jammin. (*See* Def's Ex. H).**

40.    The summary data shows that between November 27, 2015, and the end of her employment with DWIL, Granado delivered packages for DWIL on 210 days. According to the available vehicle weight data, Granado drove vehicles with a GVWR of 10,001 pounds or more on 66 of those days, drove vehicles with an unknown GVWR on 55 of those days, and drove vehicles with a GVWR of less than 10,001 pounds on 89 of those days. (*See* Ex. H, Granado Summary Data.)

**Response: Admitted.**

41.    The summary scanner data shows that Granado delivered packages for Jammin on 1,462 days. (*See id*.) According to the available vehicle weight data, Granado drove vehicles with a GVWR of 10,001 pounds or more on 1,176 of those days, drove vehicles with an unknown GVWR on 14 of those days, and drove vehicles with a GVWR of less than 10,001 pounds on 272 of those days. (*See id*.)

**Response: Admitted.**

42.    Granado testified that as a driver for DWIL she drove rental vehicles from Penske, though DWIL also had "a couple of" vehicles that were not rentals that Granado also drove. (Ex. D, Granado Dep. 75:25–77:23.) Granado also testified that there were times when

Jammin Delivery "had to get" a rental vehicle. (*Id.* at 212:12-17.)

**Response: Admitted.**

43.    Granado further testified that when she drove a vehicle that was not a rental for either Service Provider she would scan a barcode on the vehicle to track which vehicle she was driving that day, but that rental vehicles she drove for both Service Providers did not have vehicle numbers, so when driving rental vehicles she would input the number for the vehicle's rental agreement in place of a vehicle identification number. (*Id.* at 211:12–212:18.) Granado admits that she did not track the GVWR of the rental vehicles she drove. (*Id.* at 238:4-6.)

**Response: Admitted that Granado scanned a barcode on the truck (using the same scanner that tracked her on-duty time) to track vehicle usage, and that she entered the number of the rental agreement when using a rented vehicle. However, Granado was generally aware of the size of the rental vehicles that she drove. For example, Granado states that when working with DWIL, she drove a small truck that weighed less than 10,000 pounds. (*See* Pls.' Ex. H at 74:23–75:24). She also testified that she generally drove that same type of vehicle every day. (*See id.* at 76:15-77:4). Further, Granado testified that she learned about different vehicle weights to "determine . . . the type of vehicle" from Jammin owner Ben Connally. (*See id.* at 77:24-78:11, 78:16-25).**

44.    Granado admits that when she discussed working for each of DWIL and Jammin, it was her Service Providers who discussed with her how she would be paid. (Ex. D, Granado Dep. 83:20–84:1, 130:11–132:18.)

**Response: Admitted.**

45.    Granado admits that she never spoke with anyone at FedEx about her pay from DWIL or Jammin. (*Id.* at 84:14-16, 87:18-20, 133:16-18.)

**Response: Admitted.**

46.    Granado admits that it was DWIL and Jammin, not FedEx, that issued her paychecks and W-2s. (*Id*. at 125:18-25, 198:7–199:8.)

**Response: Admitted.**

47.    Granado admits that she never told anyone at FedEx that she believed she was owed unpaid overtime. (*Id*. at 71:16-20.)

**Response: Admitted.**

48.    Granado never received a W-2 from FedEx and never asked FedEx for one. (*Id*. at 198:25-199:8.)

**Response: Admitted.**

## II.    PLAINTIFFS' ADDITIONAL MATERIAL FACTS

### A.    FedEx Operates under a National ISP Model with Uniform Rules and Requirements Imposed on Drivers

1.    FedEx operates a nationwide package delivery network. (Def's R. 56 Statement, ECF No. 60 ¶ 1).

2.    FedEx has adopted a uniform Independent Service Provider ("ISP") model requiring all drivers to be classified as employees of an ISP but not employees of FedEx. (*See* Pls.' Ex. A,[1] Sample ISP Agreement ¶ 6.2; Pls.' Ex. B, Excerpts from Pierce Dep. at 128:9–13, 148:3–6).

3.    FedEx adopted this uniform ISP model in response to multiple lawsuits challenging FedEx's previous classification of these same drivers as "independent contractors."

---

[1]    Previously filed in *Claiborne v. FedEx Ground Package Sys., Inc.*, No. 2:18-cv-01698 (W.D. Pa. Dec. 21, 2018), ECF No. 711-1.

(*See* Pls.' Ex. C, FedEx Corporation, SEC Form 10-K (2016) at 17 (explaining the history of litigation against FedEx under its old business model, and its transition to the ISP model)).

4.     "FedEx Ground's relationship with the [ISPs] is governed by contracts, known as 'Independent Service Provider Agreements'" ("ISP Agreements"). (*See* Pls.' Ex. D, Dianna Karg Declaration, ¶ 4). These agreements "consist of a base contract and various schedules, attachments, and amendments to the base contract." (*See id.*).

5.     With minimal exceptions, the vast majority of material terms within the ISP agreements are consistently identical. (*See* Pls.' Ex. B at 31:1–17, 36:22–42:16, 137:4–18, 142:12–143:8; Pls.' Ex. E, Excerpts from Johnson Dep. at 21:7–21, 25:10–21, 74:13–22, 78:2–15, 84:17–21).

**B.     The ISP Agreement Memorializes FedEx's Uniform Control Over Drivers**

6.     Through its ISP Agreement, FedEx uniformly imposes the same basic job duties on all of its drivers. These duties include: collecting packages from the FedEx terminal; delivering packages to the customer pursuant to FedEx's detailed rules; collecting and transmitting customer signatures and scanning packages pursuant to FedEx's detailed rules (described below); picking up packages and delivering them to the FedEx terminal; returning undelivered packages to the FedEx terminal; and preparing daily logs and vehicle inspection reports, which must be submitted to FedEx. (*See* Pls.' Ex. A, Attachment A-2 ¶¶ 2.1–2.7).

7.     FedEx's ISP Agreement also establishes a list of rules and requirements that every driver must adhere to. These rules and requirements include: commercial delivery signature requirements; residential delivery package release requirements; alcohol delivery requirements; attempted deliveries and pickups, including making "three attempts on different Service Days to deliver any package"; indirect signature requirements; direct signature requirements; adult signature requirements; how to "release packages" (where and how to place them); how to

complete "indirect" deliveries; how to complete appointment deliveries; when and how to complete evening deliveries; how to complete date certain deliveries; how to complete deliveries in which the recipient is billed; collecting charges when deliveries are paid for at the time of pickup; requirements for package scanning; requirements for scanner data uploading; requirements for noting undelivered packages; timely completing a Driver Release Verification; timely completing a Confirmation of Delivery Form; and requirements for third-party deliveries. (*See* Pls.' Ex. A, Attachment A-3 ¶¶ 1–9).

8.    Through its standardized ISP Agreements, FedEx requires all ISPs to classify their drivers as employees. (*See* Pls.' Ex. A ¶ 6.2). ISPs must then agree "to submit documentation to [FedEx] . . . establishing that all of its Personnel are treated as ISP's employees under Applicable Law."  (*Id.*).  FedEx's ISP Agreements also bar drivers from working for FedEx's competitors.  (*Id.* ¶ 6.4 (providing that the ISP must agree "to the condition that ISP's Personnel assigned by it to provide Services under this Agreement not be employed by or under contract with a competitor of [FedEx]")).

9.    FedEx's ISP Agreements also establish the hiring requirements applicable to all drivers. Drivers must pass controlled substances and alcohol screening and agree to random screenings by FedEx. (*See* Pls.' Ex. A, Schedule I ¶ 1.2(B)–(C)). Each applicant's driving record must also meet eight criteria, set by FedEx, over the past 60 months. (*Id.* ¶ 1.3(A)–(H)). An applicant's driving record must also satisfy nine criteria, set by FedEx, over the past 36 months. (*Id.* ¶ 1.3(I)–(Q)). The ISP Agreements also establish specific driving experience and training requirements. (*Id.* ¶ 1.1(A)(1)–(2)). FedEx also has the power to conduct investigations and inquiries regarding the driving experience and background of drivers seeking employment to

ensure they have met these standards. (*See id.* ¶ 1.1(A)(3)). FedEx is also entitled to obtain proof

of an applicant's driving experience and completion of training. (*See id.* ¶ 1.1(A)(1)–(2)).

10.     FedEx also has uniform authority to suspend and terminate drivers through its

standardized disqualification process. FedEx maintains a policy that includes thirty-one (31)

separate offenses that require a driver's work for FedEx to be terminated or suspended. (*See* Pls.'

Ex. A, Schedule I ¶ 1.4(A)–(W)). If a driver is found guilty of one of these offenses, then that

driver is either no longer permitted to drive for FedEx (through ***any*** ISP) or must be suspended

for a time period specified by FedEx. (*See id.* ¶ 1.4(A)–(W); Pls.' Ex. A ¶ 6.4(F)). FedEx also

has the authority to conduct investigations to make a "preliminary determination" that a driver is

"in violation" or is "guilty" of any of these thirty-one "offenses." (*See* Pls.' Ex. A, Schedule I ¶

1.7).

11.     FedEx has agreed to "indemnify and hold harmless" ISPs and drivers for the

actions of all drivers while operating a vehicle in connection with their work for FedEx. (*See*

Pls.' Ex. A ¶ 14.2(B)).[2] FedEx requires that it be informed of any traffic citations involving

drivers. (*See* Pls.' Ex. A, Schedule I ¶ 5.5). FedEx must also be informed of any accident

involving drivers, regardless of whether there is any personal injury or who is at fault. FedEx

requires all drivers to maintain an "Accident Packet" in their vehicle "at all times" and fill it out

any time there is an incident or accident. (*See id.* ¶ 5.3). FedEx states that it will "make a good

faith determination of the preventability of each accident" in which a driver is involved,

according to uniform standards. (*See id.* ¶ 1.6). FedEx's ability to determine whether an accident

was "preventable" gives it significant control over the drivers because a driver who is involved

in certain "preventable" accidents will be terminated. (*See id.* ¶ 1.4(H)-(K)).

---

[2]     Willful, intentional, or grossly negligent acts or omissions are excluded from
indemnification. (*See id.* ¶ 14.2(B)).

### C.    FedEx Tracks and Maintains Scanner Data for Every Driver

12.    FedEx "maintains records pertaining to the activity of drivers employed by
Service Providers in order to comply with regulatory requirements[.]" (Def.'s R. 56 Statement,
ECF No. 36 ¶ 4).  FedEx "refers to these records informally as 'Scanner Data.'" (*Id.*).  In
particular, FedEx "houses an internal database that collects scan records for each driver
providing pick-up and delivery service across the FedEx Ground network." (*See* Pls.' Ex. F,
Susan Kernen Declaration ¶ 5).

13.    "Scanner Data reflect the time at which a driver logs-in to the scanner as on duty,
the date, information identifying the vehicle used each day and its Gross Vehicle Weight Rating
('GVWR'), and the time at which the driver logs-out of the scanner as off duty, among other
things." (Def.'s R. 56 Statement, *Claiborne v. FedEx Ground Package Sys., Inc.*, No. 2:18-cv-
01698-RJC (W.D. Pa. Dec. 21, 2018), ECF No. 375-1 ¶ 5). Scanner data also "provides the dates
and times for various activities performed by drivers . . . ." (*See* Pls.' Ex. F ¶ 5). Based on this
scanner data, "it is also possible to determine whether an SP driver was on duty for more than 40
hours during a workweek in which he or she also drove light vehicles." (*See id.* ¶ 14).

14.    FedEx's scanner data confirms "that FedEx Ground has ready access to records
showing the time a driver logged into FedEx Ground's scanner at a terminal, the time a driver
departed the terminal, and the time of the driver's last delivery of the day." *Roy v. FedEx Ground
Package Sys., Inc.*, 353 F. Supp. 3d 43, 72 n.16 (D. Mass. 2018).

### D.    FedEx Obtains Drivers' Employment Records Through ISP Audits

15.    FedEx requires ISPs to provide FedEx with drivers' confidential employment
records, including, for example, detailed payroll and timekeeping records, paystubs, federal E-
Verify confirmations, federal and state tax forms, and quarterly state unemployment

insurance/wage reports. (*See* Pls.' Ex. A ¶ 6.2(C) and (E)).[3] Through regularly conducted "wage and hour assessments," FedEx maintains drivers' confidential employment records. (*See* Pls.' Ex. G at 66–68).

16.     FedEx issues standardized documents called "Compliance Investigation Reports", detailing the findings of its wage and hour assessments. *See Claiborne v. FedEx Ground Package Sys., Inc.*, 2023 WL 8529132, at *2 (W.D. Pa. Dec. 8, 2023); *see also Claiborne v. FedEx Ground Package Sys., Inc.*, No. 2:18-cv-01698-RJC (W.D. Pa. March 2025), ECF Nos. 719-8, 744, 745.

17.     FedEx also requires ISPs to complete standardized "Annual Compliance Certifications," requiring the ISP to answer detailed wage and hour questions. (*See* Ex. I to FedEx's Mot. for Summ. J., ECF No. 37-9).

18.     The Managing Attorney of FedEx's "Legal Compliance and Ethics Group" ("LCG") described these assessments as follows:

> ***FedEx Ground's LCG conducts random assessments of independent service providers***. These assessments are not limited to wage and hour issues and whether an independent service provider is properly paying overtime wages if due. Instead, the assessments examine things like whether the independent service provider adheres to tax requirements, paystub requirements, is in good standing, has a safety program consistent with contractual obligations, and more. . . .
> ***The LCG conducts these assessments by reviewing, among other things, documentation submitted by the independent service providers.*** As discussed in Section 6 of the [ISP] Agreement, independent service providers agree to provide documentation demonstrating compliance with applicable law upon request. . . .
> [For the assessments] ***[t]he independent service provider typically provides a sampling of payroll records, time records, paystubs, tax statements, W-2 forms, and other records for its employees.***

 (*See* Pls.' Ex. D ¶¶ 6–9 (emphases added)).

---

[3]     *See also* Pls.' Ex. G, Excerpts from Bacon Dep. at 14:12–15:24; 17:19–19:7; 66:6–14; 67:21–68:3, 86:19–87:5, 109:19–110:5, 110:22–111:13.

19.    FedEx has also issued a uniform document titled "Electronic Compliance Assessment Overview," described as a "handbook," which contains detailed step-by-step instructions explaining how FedEx employees should conduct wage and hour assessments related to the drivers. (*See Claiborne v. FedEx Ground Package Sys., Inc.*, No. 2:18-cv-01698-RJC (W.D. Pa. March 2025), Pls.' Ex. I to Appendix in Opposition to Motion for Summary Judgment, ECF No. 719-9; Pls.' Ex. D ¶ 13).

20.    FedEx reserves the right to terminate ISPs for failing to maintain proper payroll and timekeeping records for its drivers. (*See* Pls.' Ex. A ¶¶ 6.2, 15.3).

**E.    Granado's Employment with FedEx**

21.    According to FedEx's summary scanner data, Granado drove for 383 total weeks while being paid through DWIL (November 2015 – April 2017) or Jammin (April 2017 – August 2024). (*See* Def's Ex. H, Granado Summary Data). Granado worked more than 40 hours per week during at least 141 weeks of the 383 total weeks worked. (*See id.*). Granado worked more than 40 hours in at least 22 weeks with DWIL and at least 119 weeks with Jammin. (*See id.*). Granado never received overtime pay driving for DWIL or Jammin. (*See* Pls.' Ex. H, Excerpts from Granado Dep. At 66:20–67:22; Pls.' Ex. I, Granado Opt-in Form).

22.    In those 141 weeks driving over 40 hours, Granado drove a vehicle weighing under 10,001 pounds in at least 37 weeks, and she drove a vehicle with an unknown weight in 10 weeks. (*See* Def's Ex. H, Granado Summary Data).

23.    Granado drove a lighter vehicle (under 10,001 pounds) on at least 361 of the 1672 days captured by scanner data (22%). (*See id.*).

24.    Granado testified that she took short 5 to 10 minute breaks and bathroom breaks. (*See* Pls.' Ex. H at 95:8–14; 161:10–25).

25.     Through DWIL, Granado was paid a weekly rate of $625 or $650. (*See id.* at 175:15–25).

26.     Through Jammin, Granado was paid a weekly rate of $850. (*See id.* at 202:14–23). Her weekly rate increased by $50 each month until it reached $1,300. (*See id.*).

27.     To log into the scanner, Granado used a FedEx ID. (*See id.* at 212:19–213:7).

28.     At DWIL, Granado generally signed into the scanner right before dispatching, despite arriving around 7:30 AM. (*See id.* at 103:21–104:4, 214:19–215:3, 216:22–217:4, 220:24–221:5). She typically spent 30 to 40 minutes working at the station before dispatching. (*See id.* at 104:7–13).

29.     At DWIL, Granado estimates that she worked about 50 to 60 hours per week, or 75 hours per week during peak season. (*See id.* at 177:17–178:3).

30.     When logging into the scanner at DWIL, Granado was instructed to input an on-duty time of 10 to 15 minutes before her dispatch time; there was no way to log in the scanner that she actually arrived at the station earlier. (*See id.* at 218:9–14; 242:15–243:20). The scanner data also does not reflect the time that Granado worked as a helper to other drivers, resulting in entire days of work missing from the data. (*See id.* at 247:17–248:6).

31.     Granado was required to input 7:30 AM as her on-duty time at Jammin, regardless of when Granado arrived at the terminal, which was typically at least a half-hour earlier. (*See id.* at 167:1–10; 217:21–218:3). Granado usually spent thirty minutes to an hour and a half working at the station before logging into the scanner and dispatching. (*See id.* at 215:20–24).

32.     After logging out of the scanner, Granado had to plug the scanner in and make sure all doors to her truck were open. (*See id.* at 222:10–13).

33.     At Jammin, Granado began working as a business contact in 2019. (*See id.* at 36:16–19). As a business contact, in addition to still delivering packages for FedEx, Granado responded to calls from drivers to troubleshoot issues, trained drivers, and route planned during the evening. (*See id.* at 25:12–25).

34.     Granado regularly conducted work as a business contact outside of her driving time, meaning that FedEx's scanner data does not fully represent the additional hours she spent working as a business contact. (*See id.* at 150:18–25).

35.     Thus, the scanner times underrepresent her actual working hours. (*See id.* at 214:19–215:3, 215:20–24, 215:20–24, 216:13–16, 218:4–20, 219:1–14, 222:10–13, 281:16–23).

**F.     FedEx Controlled the Terms and Conditions of Granados Employment**

36.     Granado testified that all drivers were required to complete a training program, which she understood to be mandated by FedEx. (*See id.* at 11:10–12:20).

37.     Granado communicated "pretty much daily" with FedEx staff. (*See id.* at 277:9–278:5). Emails reflect exchanges between Granado, Amber (FedEx office manager), and ISP owner Ben Connally. (*See id.* at 187:4–13). She received texts from FedEx employees about driver login statuses and package coding. (*See id.* at 194:3–9, 194:13–22, 195:3–14).

38.     Some of these emails included FedEx staff directing the ISP operations, therefore directing the drivers. (*See id.* at 276:10–19). For example, FedEx staff emailed to correct improper "service cross" coding and instructed all drivers (through Granado and other ISP personnel) to follow FedEx's established procedures. (*See id.* at 260:23–261:14). Also, FedEx staff instructed that drivers should not give out the station's phone number, but instead direct customers to call the number displayed on trucks directly. (*See id.* at 274:4–275:3). Granado relayed FedEx instructions to drivers. (*See id.* at 276:16–19).

23

39.     As a business contact at Jammin, Granado would receive instructions from FedEx employees regarding missed deliveries and signatures, which she relayed to drivers. (*See id.* at 30:6–16). Granado would also field questions from FedEx employees about pickup. (*See id.* at 41:1–10). When route planning during the evening, Granado would be in email contact with FedEx employees. (*See id.* at 42:18–43:2).

40.     Granado testified that the FedEx office manager would inform the ISP owner when a driver was approved for hiring, and the ISP would then notify the driver. (*See id*. at 156:5–10).

41.     For package issues, drivers were instructed to contact FedEx employees rather than ISP personnel, who lacked the systems and software needed to assist. (*See id.* at 160:13–161:1). FedEx staff handled questions about driver login, package coding, and package possession. (*See id.* at 41:11–25). When drivers needed help with delivery locations, Granado testified that they called the terminal, where FedEx answered. (*See id.* at 42:1–17).

42.     Aside from using FedEx IDs to sign into the scanners, Granado testified that drivers could not leave the terminal until FedEx authorized departure. (*See id.* at 213:8–14, 215:4–16). Only then would drivers log into the scanners and depart. (*See id.* at 215:17–19).

43.     FedEx packages, handled by FedEx employees, were loaded onto the ISP trucks for delivery by the drivers. (*See id.* at 289:23–290:16; 299:9–301:4).

44.     While on deliveries, Granado understood that FedEx imposed signature requirements on drivers and implemented a picture-proof program, which required drivers to take pictures for all non-signature deliveries. (*See id.* at 286:11–24, 287:3–5, 287:11–17). Drivers could not proceed to their next stop without taking the photo, and if they failed, Granado testified that FedEx employees would require them to return to the location. (*See id.* at 287:19–

24

289:11). FedEx controlled dissemination of updated signature requirements. (*See id.* at 296:22–297:15).

45.     When drivers returned, Granado noted they kept the doors of their trucks open so FedEx staff could check for undelivered packages. (*See id.* at 222:11–16).

46.     Drivers were required to swipe in with FedEx badges to access the station gate. (*See id.* at 282:25–283:3).

47.     Granado's FedEx badge did not change when she left DWIL and joined Jammin. (*See id.* at 94:6–12)

48.     Any new driver had to pass a First Advantage background check. (*See id.* at 283:4–16).

49.     Drivers wore uniforms prominently displaying the FedEx logo, which led customers to believe they were FedEx employees. (*See id.* at 284:15–23). Aside from an arm patch, this uniform did not change when Granado changed ISPs. (*See id.* at 289:11–19).

50.     Drivers drove trucks with prominent FedEx logos. (*See id.* at 284:8–11). Granado testified that FedEx required cameras to be installed on the trucks. (*See id.* at 56:1–10).

51.     Granado knew drivers could be disqualified from service, though she had not seen FedEx's disqualification guide. (*See id.* at 286:3–7).

Dated:  September 5, 2025                    Respectfully submitted,

                                            TIMOTHY ATWOOD and PHOEBE GRANADO,

                                            By their attorneys,

                                            *s/ Shannon Liss-Riordan*
                                            Shannon Liss-Riordan (MA 640716) (*pro hac vice*)
                                            Harold Lichten (MA 549689) (*pro hac vice*)
                                            Sarah Schalman-Bergen (PA 206211)
                                            Jeremy Abay (PA 316730) (*pro hac vice*)
                                            LICHTEN & LISS-RIORDAN, P.C.
                                            729 Boylston Street, Suite 2000
                                            Boston, MA 02116
                                            (617) 994-5800
                                            sliss@llrlaw.com
                                            hlichten@llrlaw.com
                                            ssb@llrlaw.com
                                            jabay@llrlaw.com

                                            *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2025, I caused a true and correct copy of the foregoing to be filed with the Court's CM/ECF system, which constitutes service on Defendant, whose counsel are registered participants on that system.

*s/ Shannon Liss-Riordan*
Shannon Liss-Riordan